Chase J. Potter
Texas Bar No. 24088245
Joshua J. Iacuone
Texas Bar No. 24036818
Greg McAllister
Texas Bar No. 24071191
Anna Olin Richardson
Texas Bar No. 24102947
potter@imcplaw.com
josh@imcplaw.com
greg@imcplaw.com
anna@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
214.432.1536

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 7** |
| | § | |
| **WITH PURPOSE, INC.,** | § | **Case No. 23-30246-MVL-7** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **SCOTT M. SEIDEL, TRUSTEE,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adv. No. _____** |
| | § | |
| **WINSTON & STRAWN LLP; and** | § | |
| **MICHAEL BLANKENSHIP,** | § | |
| | § | |
| Defendants. | § | |

## <u>TRUSTEE'S ORIGINAL COMPLAINT</u>

Scott M. Seidel (the "Trustee" or "Plaintiff"),[1] as the chapter 7 trustee of With Purpose, Inc. (the "Debtor" or "GloriFi" or the "Company"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files this Original Complaint (the "Complaint") against the following (collectively, "Defendants"): Winston & Strawn LLP ("Winston Strawn" or the "Firm") and Michael Blankenship ("Blankenship"). In support thereof, the Trustee respectfully shows the Court as follows:

## I.
### SUMMARY – WHAT THIS LAWSUIT IS ABOUT

1.      This lawsuit is about the substantial role Winston Strawn – one of the largest law firms in the world, boasting almost 1,000 attorneys across its worldwide offices – played in the destruction of the Firm's own client: GloriFi.

2.      The Trustee seeks to hold Winston Strawn accountable for the massive financial harm caused by Winston Strawn's malpractice and intentional breaches of its fiduciary duties – specifically, Winston Strawn's remarkable malfeasance resulting in GloriFi going from a valuation of *$1.7 billion* to *zero* in a matter of months.

3.      The facts of this case make for a John Grisham novel about the dangers in, and destruction caused by, conflicts of interest in BigLaw. Sadly, for GloriFi and its legion of stakeholders and unpaid creditors, this is no fiction novel.

4.      Winston Strawn was hired and paid by GloriFi to provide the legal expertise and services needed to guide the Company through the close of a de-SPAC transaction with DHC

---

[1]      Pursuant to the court-approved 9019 Agreement and Joint Prosecution Agreement, GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, the Trustee authorizes and approves the filing of this action.

Acquisition Corp. ("DHC"). That transaction would have resulted in GloriFi going public at an incredible valuation of approximately $1.7 billion.

5.        Winston Strawn's client was <u>GloriFi</u>. Winston Strawn owed fiduciary duties to <u>GloriFi</u>. And Winston Strawn was ethically obligated to advocate for and protect <u>GloriFi's</u> interests.

6.        But Winston Strawn betrayed its fiduciary duties owed to GloriFi in favor of appeasing and protecting Toby Neugebauer ("Neugebauer") – GloriFi's wealthy founder, CEO, and majority shareholder who, with the active participation and assistance of Winston Strawn, repeatedly engaged in destructive self-dealing and pressure campaigns against GloriFi's interests, outside investors, and independent board members.

7.        Winston Strawn knowingly and actively participated in, often orchestrating and/or executing, various schemes designed to benefit the personal interests of Neugebauer to the extreme detriment of GloriFi. Winston Strawn's negligence and intentional bad acts proximately caused GloriFi's (i) existing investors (which included the likes of Peter Thiel, Joe Lonsdale, Ken Griffin, and Vivek Ramaswamy and who Winston Strawn ***knew*** were ready, willing, and able to provide the funding needed to close the de-SPAC transaction) to lose confidence in GloriFi, and (ii) resulting inability to close the de-SPAC transaction and go public at a valuation of $1.7 billion. Thus, Winston Strawn's wrongdoing was a proximate cause in the nearly ***$2 billion in lost enterprise value*** suffered by GloriFi.

8.        Winston Strawn's undying allegiance to Neugebauer continued throughout GloriFi's bankruptcy proceeding. Winston Strawn supported the proposed "Neugebauer chapter 11 conversion plan." This plan did not propose the restructuring of any business for GloriFi. Instead, the strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a lawsuit (for

which Winston Strawn helped Neugebauer try to secure creditor support, litigation financing, and media attention) alleging a grand RICO conspiracy against approximately 30 proposed defendants, which include some of the country's most successful and influential business leaders, such as Ken Griffin's Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson; Nick Ayers; and more (the proposed lawsuit even suggesting that Donald Trump, Jr. was somehow involved in the so-called "conspiracy" and stating "the Trump name was toxic with Wall Street" in 2022).

9.      In publicly available marketing materials, Winston Strawn prominently lists Ken Griffin's Citadel as one of Winston Strawn's clients. Publicly available materials show that Winston Strawn also represented Jeff Sprecher's Intercontinental Exchange (ICE). Unbelievably, to appease Neugebauer, Winston Strawn publicly supported Neugebauer's plan to file a fantastical RICO conspiracy lawsuit ***against Winston Strawn's own clients***.[2] Winston Strawn even (i) attempted to help Neugebauer secure litigation financing to pursue the so-called "RICO conspiracy" against Winston Strawn's current and/or former clients and solicit creditor support of the proposed lawsuit, and (ii) spoke to Forbes magazine at Neugebauer's request regarding the accusations.

10.      Moreover, in a clear breach of Winston Strawn's duty of confidentiality, Winston Strawn willingly and intentionally provided privileged information that belongs to the Estate – without alerting, much less obtaining approval from, the Trustee – to the lawyer representing Neugebauer to use against the Trustee and the Estate. Winston Strawn made this completely inappropriate disclosure of privileged information after the Trustee's lawyers made a simple, obvious request: that Neugebauer provide evidence supporting the fantastical RICO conspiracy

---

[2]      Or affiliated entities of such clients.

claims, which Winston Strawn signed off on *against Winston Strawn's own clients*. In response, Neugebauer's lawyer (to whom Winston Strawn wrongfully disclosed privileged information) wrote: "*They can't be serious*."

11.    Neugebauer forwarded this e-mail exchange to Blankenship with the message, "*these guys are disgusting*," to which Blankenship responded: "*Yup. Happy to chat*." Winston Strawn's breach of its sacrosanct duty of confidentiality to Winston Strawn's client (GloriFi) is inexcusable and caused the Estate to suffer substantial harm.

12.    Why would Winston Strawn go to these lengths? The answer is obvious: it was a cover up. Winston Strawn wanted to cover up the Firm's misdeeds and escape liability. If the Neugebauer chapter 11 conversion plan succeeded, Winston Strawn knew the stunning facts set forth herein (and Winston Strawn's breaches of the fiduciary obligations the Firm owed GloriFi) would be swept under the rug. Specifically, Winston Strawn knew Neugebauer gaining control of the Estate would result in the Firm's wrongdoing never coming to light and this lawsuit – which *seeks $1.7 billion in lost enterprise value from Winston Strawn* – never being filed. Moreover, as discussed further below, Winston Strawn choosing Neugebauer over the Firm's actual client (GloriFi) was also a *quid pro quo* for Neugebauer referring Winston Strawn (specifically, Defendant Blankenship) to Neugebauer's wealthy oil and gas tycoon friends in West Texas.

13.    Winston Strawn and Blankenship were apparently willing to sell Winston Strawn's other prominent clients – like Ken Griffin and Jeff Sprecher – down the river (specifically by Winston Strawn supporting Neugebauer's plan to file a fantastical RICO conspiracy lawsuit against the Firm's other clients and trying to help Neugebauer secure creditor support, media attention, and litigation financing for the proposed lawsuit and/or accusations therein) in an effort to effectuate the desired "cover up" for Winston Strawn and more business generation and fee

credits for Blankenship. The acts taken by Winston Strawn to assist Neugebauer in harming and destroying Winston Strawn's actual client (GloriFi) are truly astonishing.

14.     In this lawsuit, the Trustee asserts the following claims: (1) negligence (legal malpractice) against all Defendants; (2) aiding and abetting Neugebauer in his breaches of fiduciary duty (against all Defendants); and (3) various fraudulent transfer and disallowance claims against Winston Strawn.

## II.
### JURISDICTION AND VENUE

15.     On February 8, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "Estate").

16.     The Trustee is the duly appointed chapter 7 trustee of the Estate.

17.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

18.     Such jurisdiction is core under 28 U.S.C. § 157(b)(2). To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of final orders and judgment.

19.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
### THE PARTIES

20.     The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity.

21.     Defendant Winston & Strawn LLP is a law firm registered as a Delaware limited liability partnership. Since 2011, Winston Strawn has had an office in Houston, Texas, located at

800 Capitol Street, Suite 400, which presently has approximately 60 attorneys. Since 2017, Winston Strawn has had an office in Dallas, Texas, located at 2121 N. Pearl Street, Suite 900, which presently has approximately 95 attorneys. Pursuant to Fed. R. Bank. P. 7004(b), Winston Strawn may be served with process in this Adversary Proceeding by and through its registered agent as follows: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

22.     Upon information and belief, Defendant Michael Blankenship is a resident of the State of Texas. Pursuant to Fed. R. Bankr. P. 7004(b), Blankenship may be served with process in this Adversary Proceeding anywhere he may be found, including at his business address: 800 Capitol Street, Suite 2400, Houston, Texas 77002.

## IV.
### THE FACTS

---

***Winston Strawn was retained by GloriFi and, thus, was <u>supposed</u> to protect GloriFi's interests – that did <u>not</u> happen.***

---

23.     Winston Strawn was retained by GloriFi (***<u>not</u>*** Toby Neugebauer) for the purpose of guiding GloriFi (***<u>not</u>*** Toby Neugebauer) through a de-SPAC transaction that would have taken GloriFi public at a valuation of approximately ***$1.7 billion***. Winston Strawn (either intentionally or negligently) completely lost sight of its mission and the reason the Firm was hired. As evidenced by the facts outlined herein, rather than providing GloriFi the legal expertise needed to capitalize on and close the de-SPAC transaction, Winston Strawn's goal was clear: do Neugebauer's bidding and protect his personal interests irrespective of whether that harmed, or even destroyed, Winston Strawn's actual client – GloriFi.

24.     On December 29, 2021, Blankenship (the current managing partner of Winston Strawn's Houston office and current member of Winston Strawn's executive committee) sent an e-mail to the "Winston A-Team":

> *"Winston A-Team, we have been hired to help a new target in a de-SPAC deal. The target is backed by the co-founder of Quantum Energy Partners [Toby Neugebauer], the CEO of NYSE [Jeffrey Sprecher], and founder of PayPal [Peter Thiel]. They are all actively involved. The company is a FinTech company that will rival SoFi, Lemonade and other comparables over the coming years. The company is working with a few SPACs on potential de-SPAC deals. They would like to begin work on an S-4 right away (i.e., Monday)."*

25.     Blankenship sent a follow-up e-mail to the same group, expressing excitement regarding the engagement and Winston Strawn's desire to secure future work through Neugebauer:

> *"They chose us over Kirkland. As background, Wachtell does their insurance stuff, Jackson Walker did all corporate stuff and Chapman did employment stuff. **They are looking to consolidate to us after the deal is done**. I mentioned our great team and he was quick to make sure it was the A team. I reassured him (Toby) that we are the A-team . . . . The company is called GloriFi (legal name is With Purpose Inc.) . . . ."*

26.     The very first paragraph of Winston Strawn's engagement letter with GloriFi, which is dated December 30, 2021, and signed by J. Tyler McGaughey on behalf of Winston Strawn and Toby Neugebauer on behalf of GloriFi, states:

> *"<u>Nature of Engagement</u>: As we discussed, for all matters which you may, from time to time, request our assistance, **the firm's client will be GloriFi <u>and not</u> any director, officer or employee** of GloriFi. **The scope of our engagement will be to represent GloriFi in connection with a de-SPAC transaction**. We have agreed that our present engagement is limited to performance of services related to this matter and other various matters which you may from time to time request our assistance."*

27.     Winston Strawn owed GloriFi various fiduciary duties, including but not limited to the duties of loyalty, good faith, prudence, candor, and confidentiality. But scores of e-mails between Winston Strawn lawyers and Neugebauer reveal that Winston Strawn's loyalty lied with Neugebauer, ***not*** GloriFi, and Winston Strawn continually betrayed the fiduciary duties the Firm owed GloriFi in favor of furthering Neugebauer's self-dealing agenda.

28.     This conflict of interest severely tainted Winston Strawn's representation of GloriFi – specifically with respect to Winston Strawn's failure to ***ever*** (much less adequately) advise GloriFi that Neugebauer's self-dealing (and other bad acts of which Winston Strawn was acutely

aware) may prevent GloriFi from closing the de-SPAC transaction, which is exactly what happened. Instead, Winston Strawn actively participated and aided/abetted Neugebauer in breaching the fiduciary duties he owed GloriFi.

*Winston Strawn orchestrated and executed various schemes designed to benefit Neugebauer and harm GloriFi.*

29.    Winston Strawn was heavily involved and instrumental in serious wrongdoing that occurred in late March and into April 2022, which was perhaps the most critical time in GloriFi's history and culminated in (i) GloriFi not closing the proposed de-SPAC transaction on the table and going public at a valuation of $1.7 billion, and (ii) GloriFi's ultimate demise. Specifically, as further discussed below, Winston Strawn assisted Neugebauer (in furtherance of his personal interests and to the extreme detriment of GloriFi) in the development and execution of a scheme to (i) remove independent directors who stood in the way of Neugebauer's self-dealing; (ii) stack GloriFi's Board with Neugebauer's long-time friends and business partners, who would rubberstamp whatever Neugebauer wanted; and (iii) amend GloriFi's governing documents to force through Neugebauer's self-interested transactions.

30.    Rather than fulfilling the Firm's fiduciary obligations by protecting, and advocating for, the interests of GloriFi (the Firm's client), Winston Strawn sought to please Neugebauer – an alleged billionaire whom Winston Strawn (and, particularly, Blankenship) clearly viewed as a cash cow for current and future billings and perks (*e.g.*, Neugebauer hosting Blankenship and his family at Neugebauer's multi-million-dollar vacation home in Aspen). At every turn, Winston Strawn conceded to, and assisted Neugebauer in, his unrelenting desire to engage in rampant self-dealing and helped Neugebauer run roughshod over GloriFi and its many other stakeholders. The

following is a summary of facts evidencing Winston Strawn's negligence and breaches of its fiduciary duties in late March and April 2022 alone.

*Winston Strawn's malfeasance in March and April 2022.*

31.    In late March 2022, GloriFi was on the precipice of (i) completing the de-SPAC transaction for which Winston Strawn was retained to advise the Company, and (ii) going public at a valuation of approximately $1.7 billion. GloriFi had the support of some of the most successful, wealthy, and well-known investors in the country. But GloriFi needed another round of funding to satisfy the financial requirements of the de-SPAC transaction and go public.

32.    Rather than fulfilling his fiduciary obligations to GloriFi and doing what was needed to take the Company public (*e.g.*, implementing standard corporate governance expected of a public company operating in a highly regulated industry and considering arms-length funding options to secure the financing needed to complete the de-SPAC, which are basic items Winston Strawn *should* have been advising GloriFi to do), Neugebauer set into motion a self-dealing scheme to improve his economic position (to the detriment of GloriFi's many other stakeholders) and put a stranglehold on his control over the Company. Unfortunately, rather than protecting the best interests of GloriFi (*i.e.,* the Firm's client), Winston Strawn consistently worked to appease Neugebauer (which was a proximate cause of GloriFi's untimely and unnecessary demise).

33.    On March 27, 2022, Neugebauer sent an e-mail to Blankenship with copy to Keri Findley (who, along with Nick Ayers and Neugebauer, constituted the three members of GloriFi's Board of Directors at the time) saying:

> "Ok guys go pray hard and come to house . . . I am going to put in 10mm of super senior convertible note at the 750 valuation if I can get Ken [Griffin] to join . . . reaching out to Ken directly . . . Mike can you make it super senior and secured by animo services [GloriFi subsidiary] stock"

34.    Blankenship immediately circulated Neugebauer's e-mail internally – to Ryan Hunsaker ("Hunsaker") and Ben Smolij ("Smolij") at Winston Strawn:

> *"Ryan, can you please help with the request below? I am going to be traveling and out of office (trying a vacation). I will rope you and Ben into the email. **Note, don't they need consent for him to do so?**"*

35.    Findley responded to Neugebauer: "*I believe that is at odds w the side letter and we need shareholder approval.*"

36.    Hunsaker at Winston Strawn responded to Blankenship:

> *"Yep I'll figure it out – also don't know what super senior is. I'll look at side letters this afternoon re consent but see someone already pointed that out."*

37.    Winston Strawn's internal e-mails show the Firm ***knew*** Neugebauer (despite being GloriFi's majority shareholder, CEO, and Chairman of the Company's Board) should not be allowed (much less supported) to simply do whatever he pleased. Instead, Winston Strawn ***knew*** Neugebauer needed to obtain approval from the disinterested/independent Board members (*i.e.*, Ayers and Findley) and consent from the Company's shareholders and the Company's major Series 1 noteholders who held certain side letter rights before Neugebauer could consummate the proposed, self-interested transaction between GloriFi and himself.

38.    Winston Strawn and Blankenship hold themselves out to have subject matter expertise in related-party transactions. In fact, Blankenship is one of the editors in Winston Strawn's "Related-Party Transactions Guide – 2024,"[3] which includes a section entitled "Conflict of Interest Management" and advises:

---

[3]    https://www.winston.com/a/web/5ZXTuUYKHnT6WxK4uPpCB/pubco_related-party-transactions-guide-2024_oct2024.pdf

*"Managing conflicts of interest is crucial in maintaining the integrity of related-party transactions. Conflicts of interest can arise when individuals involved in the transaction have personal or financial interests that could influence their decision-making. This can lead to biased decisions that are not in the best interest of the company or its shareholders."*

39.     If only Winston Strawn and Blankenship practiced what they preached when presented with the clear conflict of interest resulting from the pressure play Neugebauer initiated against the independent directors and side letter noteholders as part of his incessant efforts to force through his self-dealing. But that was not the case. Instead of complying with their own guidance (in an area the Firm claims to have subject matter expertise), Winston Strawn actively participated and assisted Neugebauer in his self-dealing campaign, which resulted in extreme harm to GloriFi (specifically, the loss of investor confidence and resulting inability to close the de-SPAC transaction at the approximate $1.7 billion valuation, or any valuation, and sending the Company spiraling into chapter 7 bankruptcy). Winston Strawn identified and recognized many of the same red lights about which Winston Strawn warns in the Firm's "Related-Party Transactions Guide" but blew right past them to help Neugebauer.

40.     When presented with Neugebauer's related-party transaction, Hunsaker wrote in a Winston Strawn internal e-mail, "*my recollection is you can't do debt senior to series 1 without their consent,*" to which Blankenship replied, "*agreed especially super, super **secret** senior.*" Winston Strawn **knew** Neugebauer wanted to conceal the "super senior" self-interested note from GloriFi's other stakeholders because it directly conflicted with prior representations made by Neugebauer in securing their investment. Undeterred, and making his intentions abundantly clear, Neugebauer responded, "*it has to be super senior.*"

41.     As part of his pressure play, Neugebauer instructed Winston Strawn that the Asset Purchase and Assumption Agreement and Marketing Agreement – self-interested transactions that would have resulted in transferring the Company's "tech stack" (the asset Neugebauer repeatedly

represented to GloriFi's investors was worth hundreds of millions of dollars and would serve as the security and downside protection for their investment) to a separate entity wholly owned and/or controlled by Neugebauer and his family – must be sent to the Board because, according to Neugebauer, immediately approving the self-interested transactions was "life or death" for GloriFi. In a telling e-mail from Neugebauer (making clear his self-interested intentions), Neugebauer informed Blankenship, Hunsaker, and others:

> "I knew this was coming and frankly **I want for myself** . . . highly confidentially Chris Gaertner [principal of DHC Acquisition Corp. – the de-SPAC partner] has a person he has worked with for 25 years . . . he is a player at 50 [million] . . . **I do not want this discussed with anyone that is not on this email** . . . But he and I and anyone else is going to want a security interest in tech stack . . . Let's incorporate as I will need to get investor approval in the am . . . as we are down to last 5 mm as projected."

42.     Winston Strawn partner Chris Ferazzi ("Ferazzi") immediately recognized the self-interested nature of Neugebauer's plan and identified various steps Winston Strawn **should** have taken:

> "While probably not a huge deal, you would normally have Toby abstain from voting given that Toby (or his affiliate) is the maker of the note. However, this would require you to obtain board approval in the form of minutes instead of a consent since board consents need to be unanimous. Regardless of whether we ultimately do this by written consent or minutes, while it is obvious the recitals should acknowledge Toby's conflict of interest in the transaction given he or his affiliate is maker of the note and that the disinterested board members determined that the terms of the note are fair and comparable to terms it would agree to with an independent third party."

43.     Instead of following the steps Ferazzi identified, Winston Strawn proceeded to help Neugebauer push through his self-dealing through unrelenting threats and pressure campaigns (*e.g.*, threats of litigation, removal from the Board if the disinterested directors did not approve Neugebauer's self-interested transaction, and that the Company would be forced into bankruptcy if noteholders did not consent).

44.    In "negotiating" the terms of Neugebauer's self-dealing note with GloriFi, Winston Strawn was ***supposed*** to be representing the Company's interests. Rather than pushing back in any material way in that "negotiation," Winston Strawn went out of its way to make the terms more favorable to Neugebauer.

45.    For example, Hunsaker suggested New York for the choice of law provision in the self-interested note to provide Neugebauer the opportunity to charge Winston Strawn's own client (GloriFi) the highest interest rate possible without violating state usury laws.

46.    On March 29, 2022, Hunsaker sent an e-mail to Ferazzi saying "it doesn't matter . . . to me" whether GloriFi would be pledging only the equity in its subsidiaries or granting security in all assets of the subsidiaries with a subsidiary guarantee – whatever Neugebauer wanted.

47.    Incredibly, Winston Strawn avoided involving the disinterested directors (Ayers and Findley) on these "negotiations" and, instead, took direction from Neugebauer (*i.e.*, the self-interested director and other party to the transaction – **whom Winston Strawn recognized in writing should have abstained and removed himself from the process**). Winston Strawn's lack of inclusion of Ayers and Findley on these company-critical negotiations, especially given the insider nature of the proposed transactions, is startling and constitutes another breach of the fiduciary obligations the Firm owed GloriFi and the applicable standard of care.

48.    During late March 2022, Winston Strawn was preparing to carry out Neugebauer's plan to pressure and force shareholders, Series 1 side letter holders, and disinterested directors into approving Neugebauer's self-dealing. On March 30, Ferazzi identified several issues with the scheme:

*"My only observation is it is very odd that the stockholders meeting is being held before the board meeting to approve the transaction. As a stockholder, I would want to know that the disinterested directors approved the transaction and have determined it in the best interest of the company. Also, it may be hard for the stockholders to take action if Toby abstains—do the other stockholders represent a majority of the voting shares—or are the Toby affiliated stockholders planning on voting on the proposal. I would normally see in situations like this that the disinterested board approve the transaction and potentially require the transaction be approved by a majority vote of the disinterested stockholders in an effort to provide the transaction and Toby maximum protection. Has Chapman weighed in on this and instructed Toby to abstain from all voting?"*

49.    Notwithstanding the issues identified by Ferazzi, Winston Strawn proceeded to oversee a Board meeting wherein Neugebauer made overt threats of litigation against the disinterested directors, said he was going to abstain from voting, proceeded to call the vote, and then voted in favor of his self-dealing. And Winston Strawn did nothing to protect its client's interest. Winston Strawn *knew* Neugebauer was using the Firm as a pawn to defraud shareholders and the disinterested directors – and Winston Strawn knowingly and actively participated in same.

50.    On March 30, 2022, Findley wrote to Blankenship:

*"Mike, Toby is under the impression that you and I talked this morning and you told me that the legal analysis of the marketing agreement and asset purchase agreement came in clear of conflicts or issues. Obviously, unless something happened without my knowledge, that call did not happen. Can you please explain to me what you had told him? I'm obviously available anytime."*

51.    Blankenship responded to Findley:

*"Agreed. Clearly a misunderstanding here. That is not what I told him. I told him we were preparing a legal analysis. Didn't mention conflicts on my call."*

52.    Perhaps, if Neugebauer's misrepresentations regarding the Firm only happened once, Winston Strawn may have believed Neugebauer was honestly mistaken. But that was not the case. With respect to the very legal analysis Blankenship referenced in his e-mail to Findley (which Neugebauer repeatedly tried to stonewall the disinterested directors from receiving), Ayers sent Blankenship the following e-mail:

*"Mike – Toby just called and said that you told him today that I was wrong to ask for a memo to the board and that I was making a mountain out of a molehill to ask you all to provide a legal briefing to the board explaining the marketing agreement. Because Toby is on both sides of this transaction we are trying to protect both he and the company from conflicts of interest. If it is Winston's opinion that the board should consider this matter without legal guidance please let me know. If I have bad information also please advise so we can address this issue . . . . I have copied Keri Findley and not copied Toby as he has recused himself from this matter – though he continues to call us and demand we approve it."*

53.     Blankenship responded to Ayers:

*"For the record, I did not communicate or state that to Toby. I simply responded to him that we were providing you guidance without making a determination as to what you all should do with respect to the information. You certainly should have legal guidance and we often support board members by educating them on various legal matters. I agree with the steps here and that you all should be fully informed and take the time to be so informed. We certainly will do that on our end and I expect the company would provide you with market information about the transaction. I am happy to discuss tomorrow."*

54.     In addition to the disinterested directors, Winston Strawn **knew** Neugebauer was making various misrepresentations to shareholders in connection with Neugebauer's efforts to force through his self-dealing. For example, on March 30, 2022, law firm Chapman Cutler stated to Ferazzi:

*"Chris [Ferazzi] – unless Toby chimes in otherwise, I am told that the warrants are only nixed if the company prepays the note in the first 30 days. If the note is still outstanding after 30 days, then the warrants are required."*

55.     In response, Ferazzi sent the following internal e-mail to Blankenship, Hunsaker, and other Winston Strawn lawyers: "*Guys, is that how you understood Toby's discussion during the shareholder call??*" Hunsaker responded: "*Not at all, he said they were not included at all and it was dropped.*" But Winston Strawn was unfazed by Neugebauer's misrepresentations (made for the purpose of trying to push through his self-interested note) to shareholders and continued actively participating and aiding and abetting Neugebauer in his self-dealing (undeterred by whether Neugebauer's knowing misrepresentations may rise to the level of securities fraud).

56.     Specifically, Winston Strawn began sending out consents designed to approve Neugebauer's self-dealing. After Winston Strawn did Neugebauer's bidding and sent out the consents, Ayers sent Blankenship the following (after receiving the consent via DocuSign from Winston Strawn):

> *"FYI...Did you all [Winston Strawn] approve how this DocuSign waiver was marketed in this presentation? The presentation makes it sound like 30mm into the DHC deal which shareholders were briefed on Sunday night and Toby told them he was putting in the first 10mm...But the DocuSign is not that term sheet—it is Toby's which two of our investors have strongly opposed through Keri Findley and threatened legal action.....Are our conversations privileged.....Are they private? How do we report suspected fraud, threats, and harassment when the HR director who was cataloging them was threatened and fired....What are my obligations as a board member when the CEO and majority shareholder are lying to and misleading the board while threatening and disparaging them if we do not do what he wants."*

57.     After receiving such a concerning e-mail, Winston Strawn (*i.e.*, Company counsel) should have taken that e-mail very seriously and initiated immediate steps to make certain the process involving Neugebauer's self-interested transaction (the very topic on which Winston Strawn and Blankenship authored the Firm's "Related-Party Transactions Guide") was handled appropriately to ensure shareholders and noteholders were not being defrauded. But Winston Strawn took a much different approach.

58.     Incredibly, Winston Strawn proceeded to help Neugebauer (i) remove Ayers and Findley from the Board (thus removing any roadblocks to Neugebauer engaging in unfettered self-dealing), and (ii) stack the Board with Neugebauer's long-time friends and business partners who would rubberstamp whatever Neugebauer desired. In sum, to aid and abet Neugebauer in his self-dealing, Winston Strawn was intentionally violating its client's best interest: helping the Company go public through the proposed de-SPAC transaction, which is what Winston Strawn was retained and paid by GloriFi to do – ***not*** look out for Neugebauer's self-interests.

59.     Before Winston Strawn helped Neugebauer remove Findley from the Board, she expressed serious concerns (and copied Winston Strawn):

> *"Toby, you have a term sheet from DHC that you won't show me. You said you would put in the first 10mm of the capital for DHCs termsheet on the call with ALL your investors Sunday. Put in the 10mm you said you would and let DHC come w the rest over the next 30 days. This is the only option you have and you promised your investors you would do it. I can't understand what is going on here."*

60.     In response to Neugebauer's threat to put the Company into bankruptcy if his self-interested transaction was not immediately approved (a threat Neugebauer made on multiple occasions and often copying Winston Strawn on same), Findley wrote (again copying Blankenship on her concerns):

> *"Toby, if you file the [convertible note] holders get the tech stack from my understanding of the docs. You will not keep anything. Again, you have a term sheet from DHC that you won't show me. You said you would put in the first 10mm of the capital for DHCs term sheet on the call with ALL of your investors Sunday. Put in the 10mm you said you would and let DHC come w the rest over the next 30 days. This is the only option you have and you promised your investors you would do it."*

61.     While Winston Strawn's client was in a crisis (and at risk of losing investor support and the opportunity to complete the de-SPAC transaction at the $1.7 billion valuation, which is exactly what ultimately happened) due, in large part, to the majority shareholder's incessant self-dealing (which  Winston Strawn actively participated in and aided/abetted), Winston Strawn joked and laughed about a decisively not "humorous"  situation. For example, Winston Strawn partner Jordan Klein wrote to Hunsaker:

> *"How do I get off of this ride 😂 "*

62.     Unfortunately, for GloriFi, the rollercoaster "ride" was headed off the rails and into chapter 7 bankruptcy due, in large part, to Winston Strawn's conflicted/negligent representation and multiple breaches of the fiduciary duties Winston Strawn owed GloriFi.

63.     On March 31, 2022, Winston Strawn again recognized, in writing, the need to disclose and handle Neugebauer's various conflicts in the self-interested transaction. Specifically, Ferazzi wrote to Blakenship, Hunsaker, and various others at the Firm:

> *"In light of the situation, we need to take a fresh look at these and certainly disclose the conflicts as it relates to Toby with respect to the APA and marketing agreement similar to the credit facility. I would also like to disclose his conflicts more specifically, including his role as a director (or equivalent position, e.g., manager of an LLC), whether he or his affiliates/relatives (e.g., wife or kids) control the board, any officer position in which he and his relatives serve in the counterparty, and that he or his affiliates/relatives are controlling equity owners of the counterparty."*

64.     Instead, Winston Strawn focused on aiding and abetting Neugebauer to remove the disinterested directors. Winston Strawn did so even though Neugebauer forwarded an e-mail from another law firm to the entire Company, advising:

> *"Toby – I haven't had a chance to circle up with Michael yet, but my strong view is that having the stockholders (without you) remove/replace board members in order to approve the note is highly likely to lead to a lawsuit."*

65.     In response, Blankenship simply wrote to Ferazzi and Smolij:

> *"Mess."*

66.     It certainly was a mess, and one largely caused by Winston Strawn's (i) unwillingness to protect GloriFi's interests, and (ii) unwavering commitment to further Neugebauer's self-dealing and personal self-interests. Winston Strawn did nothing to fix this "mess." Winston Strawn instead added fuel to the fire by intentionally fanning the flames of the conflict.

67.     After Neugebauer made clear to Winston Strawn that his plan was to remove Findley from the Board to push through his self-dealing, Ferazzi wrote internally:

> *"I assume we do not do anything with this information, but lay low."*

68.     While doing nothing as Company counsel wasn't the answer, doing nothing may have been better than what Winston Strawn did.

69.     Winston Strawn jumped right into the middle of the conflict, attempting to protect and further the interests of Neugebauer (to the detriment of GloriFi), of course. Winston Strawn helped Neugebauer respond to counsel retained by Ayers and counsel retained by various noteholders when Neugebauer (with Winston Strawn's active participation) initiated step 2 of the scheme to stack the Board and defraud the noteholders – *i.e.*, removing Ayers (just like Neugebauer and Winston Strawn did days prior with respect to Findley).

70.     In deciding how to respond to counsel for the noteholders, Blankenship sought counsel from Winston Strawn partner Matthew DiRisio ("DiRisio") who advised:

> *"Mike, one other thought: you may also want to clarify that we're company counsel (not "board counsel"). It may often be a distinction without a practical difference but it can be important for independence/privilege purposes."*

71.     This certainly would have been an important disclosure to make. DiRisio's concern shows Winston Strawn was scrambling to justify its past failures to put GloriFi's interests ahead of Neugebauer's interest. But it was too little and far too late. Winston Strawn's conflicted representation (caused by disregarding – or intentionally betraying – who Winston Strawn was and/or was not representing) had already caused GloriFi to suffer severe harm (through the loss of investor confidence resulting in GloriFi's inability to secure the funding needed to close the de-SPAC transaction). In fact, DiRisio later recognized: *"We need to clarify who the firm represents and where the lines are drawn in terms of taking instruction, becoming adverse, etc."*

72.     But it was clear where Winston Strawn drew the line. Winston Strawn would protect Neugebauer's self-interests at all costs, and irrespective of whether those self-interests were adverse to GloriFi. DiRisio even recognized Winston Strawn's responses to counsel for Ayers and counsel for the noteholders would likely "*be part of the litigation record*" and advised against

Blankenship's incredible statement that Winston Strawn needed to initiate a "***bulldog attack***" on behalf of Neugebauer against Ayers and the Company's noteholders.

73.    Winston Strawn partner Jeffrey Steinfeld ("Steinfeld") chimed in saying:

*"We should also consider that Nick, up until at least the 5th was a director of the company, and had a fiduciary duty in evaluating various alternatives. In that role he will likely be seen as exercising those duties to the extent he was questioning or asking for information on the SPAC transaction . . . . I don't see much in the [sic] his letters that would be evidence of interference."*

74.    DiRisio provided further guidance against Blankenship's proposed "bulldog attack":

*"I would strongly counsel against an aggressive response here (from any party) unless there are facts about Nick I don't know . . . . Otherwise, on this record, anything but a measured, factual, non-defensive response **will lead with our chin**."*

*[. . .]*

*"More importantly, if Toby's counsel wants to send a letter like that, it's ultimately up to him – I don't think it will help Toby in a fiduciary duty case (I think it will likely hurt his defense), but that shouldn't be our call. Regardless, the **<u>company</u>** shouldn't be seen as attacking a director who's raising concerns about a major transaction . . . ."*

75.    Steinfeld further stated that Blankenship's proposed approach would not be productive "***other than potentially <u>appeasing Toby</u>.***" Incredibly, Blankenship and Winston Strawn ignored the foregoing and implemented the "bulldog attack" approach to "appease" Neugebauer, and – as DiRisio said – led with Winston Strawn's chin.

76.    On April 8, Steinfeld stated that Winston Strawn does not want "*to look like we are doing the bidding of the controller.*" But it was impossible to create the façade Steinfeld wanted (in an effort to shield Winston Strawn from liability), because "doing the bidding" of Neugebauer is exactly what Winston Strawn intentionally did throughout the entirety of the conflicted representation. And it was a proximate cause in GloriFi – once valued at approximately ***<u>$1.7 billion</u>*** – currently languishing in chapter 7 bankruptcy.

77.     Around that very same time, Winston Strawn was receiving letters from Kirkland & Ellis on behalf of various Series 1 investors raising concerns related to the self-dealing schemes and actions of Neugebauer (*i.e.*, the very schemes in which Winston Strawn was actively participating and aiding and abetting Neugebauer in carrying out). Specifically, on April 12, Kirkland & Ellis stated:

> *"The Offer caps several weeks in which the CEO, director and controlling shareholder [Neugebauer] and the directors he recently appointed [Hamilton and Norwood] have demonstrated an unwillingness to conduct Company business in a manner consistent with contractual obligations, Delaware law, Federal and state securities law, and other applicable laws. Each Client reserves all rights with respect to these directors.*
>
> *Self-interested, impudent and imprudent governance not only undermines the Company's ability to finance the Company's business plan, but also undermines the investment thesis behind the Company's creation.* ***The Company has a governance crises which is causing a financing crises***. *For example, investors were excited to participate in the third-party arm's length financing proposal touted by the CEO [Neugebauer] on March 27th, but then a series of self-interested transactions have been offered instead.*
>
> *The Board has two choices: either (1) obtain the controlling shareholder's consent to establish and abide by a market-based and ethical governance structure in which he does not retain unilateral power to direct the Company (thereby opening the door to financing from third-parties and from existing investors), or (2) "approve" bad-faith, unlawful self-interested transactions in which the existing controlling shareholder funds and directs the Company according to whim (thereby cutting off access to financing from third parties and existing investors), risking personal liability for each Board member from the damages that accumulate."*

78.     Thus, Winston Strawn ***knew*** existing investors were ready, willing, and able to provide the funding needed to close the de-SPAC transaction, which Winston Strawn was retained to help GloriFi close so long as GloriFi: established and abided by a market-based and ethical governance structure in which Neugebauer did not retain unilateral power to direct GloriFi (*i.e.*, the exact things Winston Strawn *should* have been advising GloriFi to implement in preparation for closing the de-SPAC and going public). But Winston Strawn chose "Option 2." Now, Winston

Strawn faces, and must be held accountable for, the liability for substantial damages that resulted, and **about which Winston Strawn was expressly warned**.

---

### Winston Strawn's post-April 2022 malfeasance.

---

79.     Winston Strawn's malfeasance was not restricted to late March and April 2022. For example, beginning around September of 2022 (when the writing was on the wall for GloriFi's eventual failure), Winston Strawn, as counsel to GloriFi, was responsible for the preparation and circulation of GloriFi's *Secured Convertible Promissory Notes* (the "Series 2 Notes"), which were targeted for closing by September 30, 2022. However, the Series 2 Notes suffered from a major deficiency – namely that the majority of the Series 2 Notes (note numbers CN2-1 through CN2-20), which indicate a date of issuance prior to October of 2022, were backdated from the date of execution. But the Series 2 Notes do not reflect they were backdated (which appears to have been intentional). The sole exception to the backdating is note number CN2-18 dated September 8, which was executed for the benefit of Animo Bancorp, a company wholly owned by Neugebauer and his wife and which provided no capital to GloriFi in exchange for the note. All of the Series 2 Notes were tied to the *Guarantee and Collateral Agreement* (the "GCA") and *Collateral Agency Agreement* (the "CAA"), which securitized the Series 2 Notes with GloriFi's assets and granted authority to a collateral agent to protect that security interest. Winston Strawn also assisted in drafting and circulating for signature both the GCA and CAA.

80.     All the Series 2 Notes numbered CN2-1 through CN2-17 and CN2-19 through CN2-20 reflect an issuance date *prior* to the day each note was individually signed. Rather, the Series 2 Notes were not actually signed until October of 2022. Moreover, the GCA and CAA are each dated September 30, 2022, but the GCA and CAA were not fully executed until, at the earliest,

October 13. To make matters worse, much of the funding for the Series 2 Notes came from insiders of GloriFi. This intentional backdating evidences Neugebauer's (and other insiders) scramble attempt to securitize the remaining assets as the ship was sinking to the benefit of such insiders and control persons, to which Winston Strawn not only offered no push back, but were the legal architects in carrying out the scheme.

81.     These actions by Winston Strawn were designed to benefit Neugebauer and other insiders – **not GloriFi**. In fact, Winston Strawn's actions with respect to the Series 2 Notes caused GloriFi to suffer significant financial harm – which includes, at minimum, the substantial legal fees incurred by the Estate in relation to the adversary proceeding involving the Series 2 Notes that the Estate would not have incurred but for Winston Strawn's actions – as its own counsel assisted Neugebauer in another self-dealing ploy to elevate Neugebauer's economic position above those of other creditors when Winston Strawn **knew** GloriFi was headed to bankruptcy.

---

***Winston Strawn assists Neugebauer in "abusing the bankruptcy process" and publicly supports the pursuit of a fanciful RICO conspiracy lawsuit against Winston Strawn's own clients.***

---

82.     Winston Strawn's undying allegiance to Neugebauer even continued throughout GloriFi's bankruptcy proceeding. Winston Strawn signed the Restructuring Support Agreement ("RSA") in support of the Motion to Convert the GloriFi bankruptcy proceeding to chapter 11; that filing was at Neugebauer's direction over 17 months into the case. Blankenship signed the RSA on behalf of Winston Strawn.

83.     Blankenship appears to have signed the RSA in July 2024 while vacationing at Neugebauer's multi-million-dollar home in Aspen. What is even more troubling, though, is that Winston Strawn either participated in, or knowingly allowed, Neugebauer's use of the Firm as

Neugebauer's pawn (i) to solicit creditor support for the "Neugebauer chapter 11 conversion plan," and (ii) did so through various misrepresentations to creditors.[4]

84.    These very schemes and tactics, and others it appears Winston Strawn supported and/or assisted Neugebauer in employing, were found by the Bankruptcy Court, in an opinion in the GloriFi bankruptcy proceeding, to constitute an "abuse" of the bankruptcy process. Moreover, the Bankruptcy Court found that "there are a multitude of conflicts of interests that exist in this case, which the Court finds very concerning."

85.    By signing the RSA, Winston Strawn affirmed, in a public filing made in the Bankruptcy Court, that Winston Strawn supported the proposed "Neugebauer chapter 11 conversion plan." But the plan did not propose the restructuring of any business for GloriFi. Instead, the strategy of the "Neugebauer chapter 11 conversion plan" was to pursue a fantastical lawsuit alleging a RICO conspiracy against approximately 30 proposed defendants, which include some of the most successful and influential business leaders in the country – *e.g.*, Ken Griffin and his company Citadel, LLC; Vivek Ramaswamy; Joseph Ricketts; Joe Lonsdale; Peter Thiel; Jeff Sprecher; Rick Jackson; Nick Ayers; Keri Findley; and more.

86.    In other words, Winston Strawn publicly supported the filing of RICO conspiracy claims against at least one of the Firm's own clients, Citadel, LLC, and the principal of one of the Firm's other clients (Jeff Sprecher of ICE).[5]

---

[4]    During his deposition in the GloriFi bankruptcy proceeding, Blankenship indicated that numerous statements Neugebauer made to creditors, in relation to Winston Strawn and in an effort to solicit support for the "Neugebauer chapter 11 conversion plan" from such creditors, were untrue. But it appears neither Blankenship nor Winston Strawn made any effort to correct the false statements made by Neugebauer in soliciting creditor support.

[5]    Winston Strawn's publicly available marketing materials prominently lists Citadel as one of the Firm's "Representative Clients."

87.     It gets worse. Neugebauer testified that ***Winston Strawn helped Neugebauer in his efforts to prepare the proposed RICO conspiracy complaint against Winston Strawn's client (Citadel) and others.*** Specifically, Neugebauer testified (and Blankenship confirmed) that Blankenship reviewed, at least portions, of the draft RICO conspiracy complaint (*i.e.*, the managing partner of Winston Strawn's Houston office and current member of the Firm's Executive Committee willingly provided assistance to Neugebauer in his preparation of the fantastical RICO conspiracy lawsuit). Moreover, based on prior testimony, it appears Blankenship – on behalf of Winston Strawn – (i) attempted to help Neugebauer secure litigation financing to pursue the fantastical RICO claims against Winston Strawn's current and/or former clients, and (ii) spoke to Forbes magazine at Neugebauer's request regarding the accusations. The actions Winston Strawn took behind the scenes in the GloriFi bankruptcy proceeding – to further Neugebauer's self-interests to the extreme detriment of the Debtor (which, unfortunately, is per Winston Strawn's norm in connection with this badly conflicted representation) – is hard to fathom.

88.     Winston Strawn willingly and intentionally provided privileged information that belongs to the Estate – without even alerting, much less obtaining approval from, the Trustee – to the lawyer representing Neugebauer to use against the Trustee and the Estate. Winston Strawn made this completely inappropriate disclosure of privileged information after the Trustee's lawyers had the "audacity" to request that Neugebauer provide evidence supporting the fantastical RICO conspiracy claims Winston Strawn signed off on ***against Winston Strawn's own clients*** – to which Neugebauer's lawyer (to whom Winston Strawn wrongfully disclosed privileged information) responded: "*They can't be serious*."

89.     Neugebauer forwarded this e-mail exchange to Blankenship with the message, "*these guys are disgusting*," to which Blankenship responded: "*Yup. Happy to chat*." Winston

Strawn's breach of its sacrosanct duty of confidentiality to Winston Strawn's client (GloriFi) is

inexcusable and caused the Estate to suffer substantial harm.

90.     The motivation for Winston Strawn's bizarre involvement in Neugebauer's

wrongful solicitation of creditors is revealed by Neugebauer's *quid pro quo* e-mail on July 17,

2024, to his wealthy business associates in West Texas:

> *"For no personal gain…….probably to the dismay of his New York and DC
> partners he [Blankenship] stood by us courageously sharing the truth of GloriFi to
> key stakeholders. The chapter 11 filing that we made last Wednesday would not
> have had a fraction of the impact to other unsecured creditors and more
> importantly the Judge if Mike [Blankenship] had not signed on to our
> reorganization plan and staunchly supported it."*
>
> *[. . .]*
>
> *"We all know lawyers…….and we all know firms……but the next time you need the
> resources of a larger firm or the experience of one of the top lawyers in the country
> I ask you to strongly consider Mike and Winston."*

91.     It appears Winston Strawn was willing to actively participate in and aid/abet

Neugebauer in his wrongful solicitation of creditors and brazen abuse of the bankruptcy process

so long as it increased Winston Strawn's current and future bottom line.

---

### *Winston Strawn caused GloriFi to suffer massive economic damages.*

---

92.     In sum, rather than exercising fiduciary and ethical obligations Winston Strawn

owed GloriFi, the Firm intentionally took actions designed to harm GloriFi and benefit

Neugebauer and his family members/separate entities. Winston Strawn's actions (and deliberate

inactions) were a proximate cause in GloriFi suffering ***enormous*** financial harm.

93.     GloriFi was on the verge of closing the de-SPAC transaction with DHC and going

public at a valuation of approximately ***$1.7 billion***. As of the date of this filing, Winston Strawn's

own website still states that the proposed de-SPAC transaction would have provided

"approximately US$279M to GloriFi's balance sheet from DHC's trust after expenses . . ." and "[t]he transaction values the combined company . . . at a pro forma enterprise value of approximately US$1.7B at a price of US$10.00 per share . . . ."[6] As stated at the beginning of this section, the very reason Winston Strawn was hired and paid by GloriFi was to provide the legal advice and services GloriFi needed to close the de-SPAC transaction with DHC and go public at such an enormous valuation.

94.    But for Winston Strawn's (i) negligence, including and not limited to the Firm's failure to adequately warn and advise the Company that engaging in the self-dealing schemes and other wrongful acts the Firm assisted Neugebauer in carrying out would likely result in killing the very de-SPAC transaction Winston Strawn was hired to navigate the Company through, and (ii) active participation in assisting, and developing and/or executing on the game plan for, Neugebauer in his unrelenting and sustained self-dealing and fraud to the Company's extreme detriment, GloriFi would have been able to close the de-SPAC transaction.

95.    Specifically, Winston Strawn's misdeeds and collusion with Neugebauer, as outlined herein, was a proximate cause of the existing investors (and potential investors) losing confidence in GloriFi and the Company's resulting inability to raise the funding needed to close the de-SPAC transaction. The Company now sits in chapter 7 bankruptcy due, in large part, to Winston Strawn's conflicted representation, malpractice, breach of the Firm's fiduciary and ethical obligations, and active participation in Neugebauer's schemes and breaches of duty. Winston Strawn must be held accountable for its significant role in GloriFi's destruction and the massive reduction in GloriFi's enterprise value from $1.7 billion to zero.

---

[6]    GloriFi Announces Business Combination with DHC Acquisition Corp. (68243300) | Winston & Strawn

**V.**
**CAUSES OF ACTION**

**COUNT 1:**    **NEGLIGENCE (LEGAL MALPRACTICE) – AGAINST ALL DEFENDANTS**

96.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

97.    As GloriFi's attorneys and law firm, Defendants owed GloriFi the duty to act with reasonable care. Specifically, in Defendants' representation of GloriFi, Defendants were required to exercise the standard of care that would be exercised by a reasonably prudent attorney under the same or similar circumstances. For the reasons set forth herein, Defendants fell well below that standard and, thus, breached their duty of care to GloriFi.

98.    GloriFi suffered significant actual and consequential damages as a result of Defendants' negligence and breaches of their duty of care. The Trustee seeks all recoverable damages from Defendants resulting from their negligence, including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 2:**    **AIDING AND ABETTING / KNOWING PARTICIPATION IN NEUGEBAUER'S BREACH OF FIDUCIARY DUTY TO THE DEBTOR – AGAINST ALL DEFENDANTS**

99.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

100.    At all relevant times, Neugebauer, who operated as an officer, director, and controlling shareholder of the Debtor, was a fiduciary to the Debtor. As such, Neugebauer owed the Debtor fiduciary duties, including the duties of loyalty and care. Given their representation of the Debtor, Defendants were fully aware of Neugebauer's fiduciary role and fiduciary duties owed to the Debtor.

101.    Neugebauer's breaches of fiduciary duty directly and proximately caused the Debtor injury by, among other things: leading investors to lose confidence in GloriFi, the Company not being able to close the de-SPAC transaction and go public at a valuation of approximately $1.7 billion (which would have resulted in approximately $279 million to GloriFi's balance sheet after closing), and – ultimately – landing GloriFi in chapter 7 bankruptcy only months later.

102.    Defendants knew Neugebauer was breaching his fiduciary duties to the Debtor and intended to (and did) substantially encourage, assist, and participate with Neugebauer in his actions as outlined herein.

103.    Defendants knew they were participating in a breach of Neugebauer's fiduciary duties to the Debtor (or, at a minimum, Defendants recklessly aided, abetted, or participated in same). Defendants had extensive knowledge of Neugebauer's actions, and Defendants willingly participated in assisting Neugebauer's efforts in furthering his unlawful schemes.

104.    At all relevant times, Defendants, in order to aid Neugebauer, acted in conflict with (or in disregard of) their duties to the Debtor to ignore clear conflicts of interest and prioritize Neugebauer's interests over the Debtor's, allowing Neugebauer to engage in self-dealing transactions and disregard normal corporate governance, all to cloak Neugebauer's scheme with the appearance of legitimacy.

105.    Defendants' assistance to Neugebauer was essential to and a substantial factor in Neugebauer's self-dealing and other bad acts, which caused catastrophic harm to the Debtor and the ultimate demise of GloriFi.

106.    Defendants did not take adequate steps to protect the Debtor and mitigate its harm. Instead of representing the Debtor's interests (*i.e.*, their own client), Defendants took actions to effectuate Neugebauer's interests. Defendants, through action and omission, aided and abetted

Neugebauer to implement a scheme to remove all independence and oversight from GloriFi's

Board, engage in self-dealing transactions to the detriment of GloriFi's other stakeholders, and kill

the potential de-SPAC merger between GloriFi and DHC (the very transaction Defendants were

retained and paid by GloriFi to help the Company close).

107.    As a result, Defendants knew or should have known that their aiding, abetting, or

participation in Neugebauer's breaches of fiduciary duty would result in harm to the Debtor.

108.    The Trustee seeks all recoverable damages from Defendants resulting from their

aiding, abetting, participation, and encouragement of Neugebauer in his breaches of fiduciary duty,

including, but not limited to, the entire loss of GloriFi's enterprise value.

**COUNT 3:    AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (11 U.S.C. § 548) –
AGAINST WINSTON & STRAWN**

109.    The Trustee hereby incorporates all factual allegations set forth above and below,

throughout this Complaint, as though fully stated in this section.

110.    GloriFi filed its voluntary petition for relief under chapter 7 of the Bankruptcy Code

on February 8, 2023 (the "Petition Date").

111.    During the one-year period prior to the Petition Date, that is between February 8,

2022 and February 8, 2023, GloriFi made transfer(s) of an interest of GloriFi's property to or for

the benefit of Winston Strawn through payments totaling not less than $790,890.00 (collectively,

the "Transfers") in relation to the Firm's conflicted and improper representation of GloriFi (for

which GloriFi obviously did not receive reasonable equivalent value from Winston Strawn for the

reasons outlined herein).

112.    During the course of this proceeding, the Trustee may learn (through discovery or

otherwise) of additional transfers made to Winston Strawn during the relevant clawback period. It

is the Trustee's intention to avoid and recover all transfers made by GloriFi which are voidable

pursuant to the Trustee's rights under the Bankruptcy Code and applicable law. The Trustee expressly reserves his right to amend this Complaint to include further information regarding Winston Strawn, the Transfers, and/or additional transfers that may become known to the Trustee at any time during this proceeding, through formal discovery or otherwise.

113.    GloriFi's funds constituting the Transfers were made in relation to Winston Strawn's improper and conflicted representation of GloriFi. Accordingly, the Trustee asserts that the Transfers are fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

COUNT 4:    AVOIDANCE OF TRANSFER – FRAUDULENT TRANSFER (TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*) – AGAINST WINSTON & STRAWN[7]

114.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

115.    Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by GloriFi that an unsecured creditor could avoid.

116.    In the alternative to the Trustee's fraudulent transfer claim under Section 548 of the Bankruptcy Code, the Trustee also pleads that the Transfers were fraudulent transfers under TUFTA because:

a.    GloriFi did not receive reasonably equivalent value in exchange for the Transfers; and

b.    GloriFi was insolvent at that time, or GloriFi became insolvent as a result of the transfer or obligation;

---

[7]    The Texas Uniform Fraudulent Transfer Act is referred to herein as "TUFTA."

c.      GloriFi was engaged or was about to engage in a business or a transaction for which the remaining assets of GloriFi were unreasonably small in relation to the business or transaction; or

d.      GloriFi intended to incur, or believed or reasonably should have believed that GloriFi would incur, debts beyond GloriFi's ability to pay as they became due.

117.    Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to his reasonable costs and attorney's fees in avoiding and recovering the Transfers.

**COUNT 5:**      **RECOVERY OF VOIDABLE TRANSFER (11 U.S.C. § 550) – AGAINST WINSTON & STRAWN**

118.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

119.    Winston Strawn was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the Transfers were made for Winston Strawn's benefit.

120.    Pursuant to Section 550 of the Bankruptcy Code, the Trustee is entitled to recover the Transfers, in the total amount of $790,890.00, and hereby seeks a monetary judgment against Winston Strawn in at least that amount with respect to the claims being asserted herein in relation to the Transfers.

**COUNT 6:**      **DISALLOWANCE OF CLAIM (11 U.S.C. § 502) – AGAINST WINSTON & STRAWN**

121.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

122.    Winston Strawn is the transferee of the Transfers, which are avoidable as stated herein. As such, the Transfers are recoverable pursuant to Section 550 of the Bankruptcy Code.

123.    Winston Strawn has not paid back any portion of the Transfers.

124.    Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, any Claim,[8] if any, Winston Strawn and/or its assignees may have against GloriFi or the Estate must be disallowed.

125.    Moreover, pursuant to Section 502(j) of the Bankruptcy Code, any Claim, if any, Winston Strawn and/or its assignees may have against GloriFi or the Estate which may have been previously allowed in the Bankruptcy Case, must be reconsidered and disallowed.

126.    The Trustee hereby requests that the Bankruptcy Court disallow all Claims, if any, of Winston Strawn.

## VI.
### ATTORNEY'S FEES AND EXEMPLARY DAMAGES

127.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated in this section.

128.    The Trustee seeks an award of exemplary damages in this case because, for the reasons set forth herein, Defendants acted with malice (*i.e.*, the specific intent to cause substantial injury or harm to GloriFi), an extreme degree of risk and a conscious indifference to the rights of GloriFi, and/or in a fraudulent manner, Defendants committed gross negligence, and Defendants committed other acts (as outlined herein) and in a manner that justifies the imposition of exemplary damages under applicable law.

129.    The Trustee further seeks an award of the reasonable and necessary attorney's fees and costs incurred in pursuing this action. An award of attorney's fees is appropriate and just in this action under Section 24.013 of TUFTA and any other applicable statutes and/or contract provisions.

---

[8]    As that term is defined in Section 101(5) of the Bankruptcy Code.

## VII.
### CONDITIONS PRECEDENT

130.    All conditions precedent to maintaining this action have occurred and been satisfied or have been excused and/or waived.

## VIII.
### CONCLUSION

Based on the foregoing, the Trustee respectfully requests the following relief from the Court:

a)    Judgment against Defendants for all actual damages, including the full amount of GloriFi's lost enterprise value (*i.e.*, approximately $1.7 billion), and any applicable special or other damages (including disgorgement);

b)    Judgment against Defendants for exemplary damages;

c)    Avoidance of the Transfers, upon the law and the facts, as fraudulent transfers;

d)    Recovery of the Transfers by way of a monetary judgment against Winston Strawn;

e)    Disallowance of all Claims, if any, of Winston Strawn filed in this bankruptcy proceeding;

f)    Judgment against Defendants for pre- and post-judgment interest at the maximum rate permitted by law;

g)    Judgment against Defendants for costs of suit and reasonable and necessary attorney's fees; and

h)    Such other and further relief to which the Trustee is entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

CHASE J. POTTER
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

JOSHUA J. IACUONE
Texas Bar No. 24036818
E-Mail: josh@imcplaw.com

GREG MCALLISTER
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com

ANNA OLIN RICHARDSON
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE